All right, Mr. McVean. May it please the court. Good morning, my name is John McVean and it's really my honor to represent Officer Felipe Gallegos today who the summary judgment evidence really shows performed absolutely heroically on January 28, 2019 in the firefight that developed at the Harding Street house. I think I should say this is such a tragic case because no officer should have been at that house that day. No one should have been killed. Officer Loving should not have been paralyzed. But Officer Gallegos did not bring those officers to the house that day. All he did was the best that he could, his duty, to try to bring them home. And in the process he did not violate any constitutional rights and certainly not any clearly established law of this court or the United States Supreme Court. The district court erred really fundamentally by ignoring this court's advice in a 1994 case called Stroyk v. Ponsetti. That's where this court said we cannot allow the theoretical, sanitized world of our imaginations to replace the dangerous and complex world that policemen face every day. With all respect to the district judge, that's really exactly what happened in the court below. I will start by talking about Miss Nicholas but I'll take questions at any time. I have a question about Miss Nicholas. Yes, your honor. Your brief argues that Mr. Gallegos or Officer Gallegos had the right clearly to shoot at Tuttle and that the bullet went through Tuttle's wrist, I guess, and hit Nicholas. But he also says that he clearly intended to shoot Nicholas. Yes, Judge, and really the various accounts that are floating around are a consequence of there have been various theories floated by the plaintiffs. And we're here on summary judgment and as the court knows very well, short of a case where we have blatant contradictory evidence, a Scott v. Harris scenario, which we've argued happened, we've got to accept the plaintiff's account. So when we say, that argument, Judge Richman, is okay, all of our arguments, Scott v. Harris, everything we say happened, all the other testimony, let's throw it away. And we're going to wholesale adopt the position... No, I don't see what Scott v. Harris has to do with this. To me, the video, let's assume that we agreed the officer with the clear arm is not Gallegos, that you're correct where Gallegos was. We still have what happened. Yeah, absolutely. The bullet went through Tuttle, hit Nicholas. What do we do with Gallegos? I saw her, I intended to shoot her. Well, Judge, I think we can't take both Gallegos and what the plaintiffs said. And we're on summary judgment and I guess we're supposed to take what what they say. But it can't be both. But if what they're gonna say is, Gallegos observes two officers, Medina and Lovings, shot at the front door, then Gallegos shoots. This is their version, Judge. Gallegos shoots in the direction of Tuttle and actually hits him, but his intent is not to kill Tuttle. Now, obviously, we don't agree with any of that. That's not what the evidence shows. That's not what Gallegos tested. Well, the officers... Go ahead. So this is their version. We've got, we're going with their version, that Gallegos raises his gun, shoots through Tuttle. Gallegos himself, Gallegos himself said, I intended to shoot her, right? He testified to that. Yes, he did testify to that. We take that as true. So how do we fit... I'm not saying you don't... No, absolutely. I'm just saying I want to hear that. Yeah, so I think what we have to do with it is we are... I don't think you can take just Gallegos' intent and separate it from the other facts that he observed. But B, under Graham versus Connor, his intent is irrelevant if the way he acted was objectively reasonable. And in fact, what the Supreme Court said in Graham is evil intentions do not make a constitutional violation out of objectively reasonable use of force. So Judge, to try to get to your question, what do you do with his intent? Actually, it's irrelevant in the legal analysis that we're supposed to undertake. In a hypothetical, the police break into a home and there's a teenage girl in there, there's a mother in there, there's a father. They see gunfire from where it turns out the father was, but no arm, the mother was not armed, the teenager was not armed. Just the fact that the father is shooting and that shooting is going around, we're not sure who, where the officers, what, who hit them. Do they get to shoot the teenager and the mother if they're not armed? Well, Judge, we'd be in a situation of we're looking at objectively reasonable use of force. Well, what is there to contradict Gallegos' apparently saying that she was near Bedina and trying to pull his gun away? And in fact, she was found with, later found with gunshot residue on her hands. There's nothing to contradict that. Their expert says that she wasn't positioned in a way that she could necessarily grab the gun. But then we're talking about the material fact dispute on summary judgment being merely whether she was just standing near Medina, who had just been shot and was laying on the couch while other officers lying paralyzed at the floor of the front door, or whether she was actually grabbing the gun. Is there any other reason why she would have gun residue on her hands? There's nothing in the record about that, Judge. Don't we need to take into consideration Gallegos' reaction to these other officers being shot? I mean, we can't ignore that. It was in less than 40 seconds, yes, Judge. And absolutely, not only can't Graham versus Connor literally says exactly that, we cannot ignore that. We have to pay attention to that and we have to give Officer Gallegos the reality of the situation that he is in, which is that. Again, this is complicated because we're talking about, well, what are the facts? And what we're trying to do is say, well, we'll draw the inferences for the plaintiffs if that's what must be done. But here's what Gallegos saw. Two officers go into the house. Medina is shot. He's on the couch. Lovings is shot. He's paralyzed at the front door. Either he sees Nicholas reaching for Medina's gun. He sees Nicholas near Medina, according to the plaintiff's expert. He, according to them, was out by the street and sees later Tuttle at the front door, shoots through Tuttle and hits Nicholas. Any of those scenarios, they have kind of picked buffet style from all the evidence to try to cobble together this Frankenstein of what occurred. You can take any of them. And given what was happening in that house on that day, what this person did was reasonable to try to save the lives of the officers who were there. This isn't a case, you know, it's to stay on Miss Nicholas. This isn't a case, and by the way, this is all, of course, underneath qualified immunity. How do we know, and I'm forgetting this, how do we know that Gallegos shot through Tuttle, which hit Medina? Was there some forensic? That's correct, Your Honor. There was DNA of Mr. Tuttle on the board. Let me ask you, this is a factual matter. I think Gallegos and others said, Gallegos said he saw two officers be, quote, pulled away from the front door. Who pulled, what does that mean? That's really not clear in the record and in the testimony exactly how that happened. It seems like perhaps it was the case that when Officer Lovings was shot and paralyzed, he fell in a manner that may have pushed those other officers out the front door. It's really not clear from the summary judgment exactly what happened for these, they kind of all fell out the door in the stack. With, I also want to make this point about qualified immunity with with respect to Miss Nicholas. Certainly the case cited by the the district court was Tennessee versus Garner, which is a case about a fleeing suspect. There's no evidence in the record, and Judge Richman, I take your concern. Obviously, an officer could never shoot an unarmed, non-dangerous person who clearly appeared to be unarmed and non-dangerous. All of the testimony in this case was that Miss Nicholas did not appear to be either unarmed or non-dangerous. In fact, Officer Pardo, moments before he fell out of the front door of the house, said that he saw Miss Nicholas standing over Officer Medina and screaming. And Pardo actually testified that he was about to shoot Nicholas if he hadn't fallen out of the house because he believed she was the shooter. So, so to hold Officer Gallegos to this, and by the way, and she had immediately resisted, I mean the officers did tell her to get on the ground and she didn't do it. I mean that's not contradicted. That's correct Judge. That's absolutely correct. And this is certainly a case where a quote non-dangerous, unarmed person might take that prudent step when the police are entering your house and there's a firefight. You wouldn't expect, even as they're, even if you take what their expert says, an unarmed, non-dangerous person in this situation to then be standing up off the couch next to the shot officer. What, we would hope that she would be on the ground and giving herself up. That's not what Officer Gallegos observed by any account if you, if you take that he did see her in the house next to Medina. Again, there's a, there's this whole other argument that he was by the street and that's where we get to, well then he shot in Tuttle's direction after seeing these two officers. Let's talk about Tuttle. In, in the Apple East Brief, they said there was 19 to 20 seconds in between the time that Gallegos shot him through the buttocks and then the back of the head and they, they've had a record side and I went and read all around that. I didn't see any reference to 19 or 20 seconds. Is there any evidence anywhere in the record about how long it was between the shot to the buttocks and the shot to the back of the head? I think you would have to watch the video, the synced video, which was exhibit AC to our motion for summary judgment and I know is in the record because we've corresponded with a clerk about that. I actually don't know. I'm sure that the Apple East will tell you exactly how many seconds it was. The, the final shot of Mr. Tuttle, it's undisputed and in plaintiff's version of events, when that final shot was fired, fired, Mr. Tuttle was still moving. Officer Gallegos said he observed Mr. Tuttle with a gun. Mr., the plaintiffs say that he could not have held a gun because of the condition of his hands. The case that I think everyone has looked at is Plumhoff versus Rickard, which is, it's a, it's a case case and it was a very serious chase and multiple police cars were hit. No policemen were shot. Certainly four policemen were not shot in that case and no police officer was paralyzed as occurred in this case. But in that case, there were 15 shots fired. There were three shots fired into the car and then 12 more. Both of the occupants, the driver and presumably more or less innocent passenger were killed. And the Supreme Court said, once we have this severe threat to public safety, there's, there's a right of the officers and actually a duty of the officers to continue until the threat is extinguished. And if the, if the person doesn't clearly give themselves up or aren't clearly incapacitated, then the continued use of force is appropriate. So in this case, this is clearly from Officer Gallegos' perspective. That's why the word clearly is in there. It's, it's not enough that as a factual matter, his hands may have been in, been shot. Officer Gallegos is the one who has to make the decision in those seconds, having seen four officers fall from victim wound, from gunshot wounds from the door of his house, whether he's going to be number five. He didn't have six years to think about this or about the condition of Mr. Tuttle's hands. He had a decision to make. Mr. Tuttle, it's undisputed, raised his body up. And that is when Officer Gallegos took the final shot. And again, judges, it's, it's so important that we're here talking about qualified immunity, because that's the legal blanket that goes over all of this. No case has been cited by the appellees in which a person even discharged a weapon at an officer. If I'm, I correctly remember this, the plaintiff's expert said that Tuttle was up on his elbows when the fatal shot was fired. Is that correct? That, that's correct. Actually, the, what, the quote that we, we cite in our brief, and this is in the record at page 10147, is that he raised his upper body by his elbows before the firing of the last shot. And given the carnage that all had been wrought by this man, from Gallegos's perspective, and I'm out of time, but I'll respond to anything on rebuttal. Thank you. All right. Thank you, sir. Mr. Avery. Good morning. May it please the Court? Jeff Avery representing the Tuttle and Nicholas families. I want to start back at the beginning because I think it's important to go over what the standard of review is here. They have to accept, as part of this jurisdictional basis, the plaintiff's facts as true. And I think from what I heard is there's a lot of fighting about facts and not a clear understanding of the facts. No, there are two things, because yes, you accept the plaintiff's version, but we also have jurisdiction if we determine that any fact disputes are not material. Correct, Your Honor. Okay. And materiality is an important thing to address under the Supreme Court's decision, Johnson. But what I want to make sure is clear is what the plaintiff's facts actually are, because I think I heard some things that maybe were inconsistent with what, or maybe I wasn't clear enough in our brief. So I want to start with Ms. Nicholas because it's, I think, vitally important to go over that. One, the issue with the video, I think it's important not to isolate that single screenshot because while I think it is very important to look at and see the particular officer and where Officer Medina is, that isn't the point of the video and why it's particularly helpful. If you look at the timing, and Judge Richmond, you asked earlier about the timing of the fatal shots. Your answer to that question for Mr. Tuttle is the video record was counseled, addressed. It is the timing of the video record. But the timing of the Ranger's sink video is vital here, because what you see is as Officer Rios, who's a perimeter officer, approaches, that's the only video we have because the officers were not wearing body cameras in this As he turns on his video, he turns his body towards the house at 36.5 seconds, 36.7 seconds in that record. You can still see Officer Gallegos to the left side of the house. And we know that because Lieutenant Wolfe is somebody that counsel of Mr. Gallegos, Officer Gallegos relied on heavily in this briefing, determined in his presentation that is where Philippe Gallegos was located. And all the way through 36.7 seconds, you can see his leg where he is. The next two seconds, there are about... Wait, wait, are you saying, are you talking about the person that, the defeated arm or something else? No, no, no, no. Yeah, this defeated arm six seconds later. I'm talking before that. We know where Officer Gallegos is because Lieutenant Wolfe placed him to the left side of the house, which is not the shooting position that he says, our forensic evidence says, he shot Ms. Nicholas from. He's on the left side of the house at 36.7 seconds. Immediately after that, we hear 10 to 12 shots. And under Officer Gallegos' own timeline, it is impossible for him to have shot Ms. Nicholas during those 10 to 12 shots through 38 seconds on the video. In fact, Officer Gallegos would have had to move around the house. And what he testified was he did not shoot inside the house until Officer Lovings fell and Officer Salazar fell. Both Officer Lovings and Officer Salazar said they shot. Officer Lovings shot nine times before he fell and Officer Salazar shot eight to 10 times. The video shows at most 10 to 12 shots in that time period. So what? It's important because the immediate two seconds, there's no more shots and Officer Medina is already at the street. Officer Gallegos could not have shot under his own timeline with Officer Medina in the house. It's impossible under the video. First, there was only a second and a half, two seconds for him to move, get in position and shoot. But it also contradicts what he said happened. And that's key here because the video makes it clear the timing is impossible for what Officer Gallegos said happened. It's also important to know, we are not claiming that Officer Gallegos shot at Mr. Tunnel. We're saying it passed through his hand because he happened to be in the doorway. We are not claiming that he aimed at Ms. Nicholas. We're taking it true. He said immediately after the shooting in his IID statement and in his deposition, I intentionally shot Ms. Nicholas because he says that she was a threat to Officer Medina. But what the video shows is that that couldn't have been because Officer Medina was already on the street regardless of the still shot. That's what I don't get. Even if Medina was on the street, we've had four officers shot before Medina's on the street. Tunnel is standing in the doorway. The bullet goes through Tunnel's right wrist and arm wrist and hits Nicholas. So what difference does it make that Medina is on the street? Because that was the one justification for why she was allegedly a danger or violent threat. No, there was other stuff. I mean, another officer had said he told her to get down and she didn't. That's undisputed. Sure. Officer Medina, when he entered, it is undisputed he told her to get down. It is also undisputed that Officer Medina testified that she wasn't a dangerous threat and she did not require deadly force based on his review of the evidence. He testified that at his deposition. He was unconscious. How does he know? When he said, I was answering Judge Richmond's question about him, about what he had testified about getting down. He was not even in the house when she was shot, is what the factual record shows as well. But did he take his gun out? I apologize. Did he remove his gun when he was evacuated after being shot in the shoulder and going unconscious? I believe the record says it was strapped to him. It was a shotgun that was strapped to him. He shot at the dog and he was pulled out. So he had a shotgun that was strapped to him. And there is no evidence, Miss Nicholas, our forensic evidence places her on the far side of the couch, eight feet away from where Officer Medina was shot. The bullet hit her in the right side of her body. If she had been over Officer Medina grabbing, it would have hit the left side. My point is, here we are at a gunfight. Tuttle had fired at least once or twice. Four officers had been injured. But even if Medina is dragged to the street, we're in the middle of a gunfight. She's sitting on the couch or ready to get up. She's not lying on the floor trying to avoid a gunfight. Medina shoots her. I'm sorry, Gallego shoots her. Two things. One, that was not an issue that was raised at all from the district court. The district court didn't address it because that was not an argument they ever raised to the district court. I'm taking your facts. You're saying they couldn't shoot her because she was just sitting on the sofa. I'm saying I'm not sure about that. Well, Your Honor, is I believe under the Supreme Court law that they have to actually show some reason for deadly force to justify deadly force under Tennessee v. Garner. And just sitting on a couch, even in a firefight, I think your question earlier about the family being in during a raid is particularly important. I don't think that it gives a police officer the ability to shoot anybody in a house just because. I agree with you. But if there's testimony that she was asked to get down, she did not. This firefight has gone on. She's sitting on the sofa or getting ready to stand up. So how in a split second is Gallego supposed to know she's not part of it, she's innocent? Well, and I think Barnes v. Felix is important here because the Supreme Court has clarified we have to look at the totality of what's going on. And that includes the fraudulent warrant that Officer Goings got and the circumstances that were brought there, that it was dark, that it was difficult for them to see. All those things matter for what a reasonable officer would do and what's clearly established. There's no evidence, am I correct, that any of the other officers knew that Goings had gotten a fraudulent affidavit? Certainly there's no direct evidence that Officer Gallegos knew. I think maybe one or two of the other officers, there is evidence of it. But we do know that he worked for him for years, that he was part of other warrants where Officer Goings had committed fraud. And I think under Barnes, it matters at least for the factor evaluation for excessive force that this was not something where Ms. Nicholas was committing a crime. She was sitting in her house. They shot her dog. They broke in. It was dark. There's a dispute about whether there was even an announcement. And she's sitting on her couch on the far side. Well, they did yell at her and she yelled and screamed and cussed at him. Correct. Maybe because the dog was shot. But anyway, and then immediately the firefight erupted. Correct. And I think it's important to note that her perspective is people break into her house, shoot her dog. It's dark. She has no idea why they're doing it, why they're there, because it was an undisputedly, you heard counsel say, fraudulent warrant. That matters for these factors in the analysis under Graham, under Barnes to look at. Well, A, if she had gotten down on the floor in compliance immediately and B, if Tuttle hadn't pulled out his gun, we wouldn't be here. It is tragic. But to say they overreacted is, you know. I don't know that the, first I want to address the second point about when Tuttle pulled out his gun. The evidence doesn't show, our forensic experts said that the first shot was the dog. And there's testimony that several officers shot the dog. Then the next shot, our forensic evidence says, was a .223 from a police officer. How do they know the sequence? That's based also on the testimony of the officers of when Medina got shot. We're taking that as true, that he was shot second. We don't know when Tuttle first fired. We know forensically that the first shot that Tuttle made, or the first shot that I can say certainly Tuttle made, was hitting Officer Lovins. He shot Lovins before Nicholas was shot. Correct. Officer Lovins, according to Officer Gallegos' timeline, Officer Lovins was shot immediately before. And he's a quadriplegic, down on the ground. Correct. Yes. Correct. The other three officers, the evidence shows, were struck by a friendly fire, and that includes Officer Medina, who was shot first before. The officers shot first. They shot the dog first. They shot Medina first. Then this firefight erupted. Based on a fraudulent warrant of police officers breaking into a house without a reason to be there, and Dennis Tuttle, yes, acted in self-defense, which he's allowed to under Texas state law to do, that is why, pivoting to Mr. Tuttle's argument, we aren't claiming that the first seven shots are unconstitutional. We recognize that Mr. Tuttle, in this very, very tragic situation, got into a firefight to defend his wife, dog, and house, like any Texan would do in that sort of situation. Even if it's the police? If he knew it was the police. We don't know, unfortunately, because he's dead. I thought they were in tactical gear with police on it. They're wearing tactical gear, but it's dark. They're wearing masks. Don't they have lights on in their house? He was taking a nap at the time, is what the record said. Well, I don't care. Yeah. I thought it was 5 o'clock in the afternoon. It is 5 o'clock, but it's very shaded. The testimony was that it was very dark in the room, based on what the officers said, how they saw it as they entered into the building. But this is why the first seven shots to Mr. Tuttle were not arguing were unconstitutional. I think they were justified criminally, but they weren't unconstitutional. The key is, once Tuttle was incapacitated, once he's down on the ground, those are the shots that are unconstitutional. Okay. And you say, if we look at the video, we can count 19 to 20 seconds between the shot to the buttocks and the shot to the head. Correct. There's a long gap. And there's a shot, and then after the shot to the head is when Gallego says, stop moving. Not before, after. And that's important, because Your Honor wrote the Mason, offered the case Mason v. Lafayette, which I think is directly on point. Was the evidence undisputed that Tuttle was still up on his elbows when he was shot? He was. He did move himself up on his elbows before he was shot. But that is no different, I think, than the plaintiff and Mason, who they said, who his girlfriend had testified, also moved. The key is whether it was in a threatening manner or whether it's just- You look at the, I mean, I looked at your expert report. We're talking about, one more question before I do this. Is it undisputed that Gallego shot outside the door frame? Shot into the house from outside the door frame? Yes. Yes. Okay. So here's, it's pretty close when you look at all the pictures of his sock feet and all that. So Gallego says, outside the door, shooting into the house. There's another officer in the house that shoot him in the head. Correct. Gallego says what he says and shoots him in the buttocks. Then you say it's 19 to 20 seconds. Gallego is still not inside the house. Tuttle is still up on his elbows with his feet towards Gallego's, his head away from Gallego's. How can Gallego see what's happening with his hands? Because he had 19 or 20 seconds to be able to tell. But he can't see it. He's behind, he's outside. The victim, your victim, Tuttle, has his feet and head opposite. His head is opposite. Gallego can't see what's in his hands or what his hands look like. Is that correct? Well, Gallego's actually testified to something different, which I think is why this makes this so difficult. He testified that Mr. Tuttle was facing him, sitting on his butt, and had the gun in his hand and raised it, which is directly inconsistent with the forensic evidence of him being shot through the back of the head. So I think it's important because we're dealing with contradicting change in testimony by Officer Gallego, who made changes related to Ms. Nicholas and also made changes related to Officer Gallego. I think that's important because we don't have objective body camera evidence, so we have to rely on the forensics to see how it lines up with the testimony. And what we know here is that there's a lot of contradictions in changing testimony, both in their stories and what the video shows. But I think the Mason case is particularly... Can I just say what your evidence shows? Sure. Our evidence shows that he was on his elbows... With his feet towards Gallego's and his head the opposite direction. Correct. So how can Gallego see what shape his hands are in or whether he has a weapon? Well, he did say that he saw his bullets strike his body, and we know that it struck his hands. Okay. I'm just saying, given where we know the body ended up... Sure. And what we know, Gallego's was... Tell me how Gallego's could see his hands and know that he didn't have a gun. What we know is he had 20 seconds to be about six, eight feet away from him, and his hands are holding himself up on his elbows. That's what we know. And we know that the gun wasn't in his hands. We know that he, based on Dr. Buck's testimony, wasn't able to hold a gun. The pictures, while graphic, show his left hand is effectively destroyed in the shooting from bullets. And we know that the gun was found on a heater away. And I think it's telling that he didn't say, don't move until after he shot him. He didn't say, don't move prior to it. The headshot that Officer Lovings told him, I think also, if you're construing the facts in favor of the plaintiff, it could be construed in a much more nefarious way of, hey, you need to kill him because we want to kill this guy, based off of this firefight. I think that matters, based on what we're seeing, because what we don't have is Officer Gallego's testimony, we know is wrong because he was not sitting on his butt holding a gun up, because we know he couldn't hold a gun, and we know he wasn't shot that way. So I think the contradiction in evidence is particularly important, because objectively, it's difficult for us to know, absent the forensic evidence of what happened. How far away was it, forensically, was the gunshot? The final gunshot? I believe it was about 8 to 10 feet. Gallego's testimony was he never entered the house during the gunfire. Did the forensics say, back that up? Yes. So you're saying the forensics said 8 to 10 feet? Correct. And that's where he was in the doorway, both the initial shot to his buttocks, which went all the way through his chin, and then the later shot to the back of the head, where he was holding himself up. But I do want to pivot back to Mason quickly, because I think it's important, because there's a quote in it that says, shooting a clearly incapacitated suspect is inconsistent with Garner's command that deadly force is unconstitutional when a suspect poses no immediate threat to the officer and no threat to others. That's what the question is here, is whether the fact says they were, whether it posed a threat to him. And I think that's important, because exactly like Mr. Tuttle, in Mason, there was evidence that the individual moved. The issue was whether it was simply moving, particularly after you've been shot eight times catastrophically, after you've seen your wife killed, after your house has been broken into, after your dog's been shot, and after you don't know what's going on. It isn't surprising that might have some movement. The issue is whether it's threatening movement, whether it's deadly movement to justify it. And I want to pivot back to Miss Nicholas as well, because I think that's also important, is under the facts as they are, Miss Nicholas was sitting on the couch, under the plaintiff's facts, and was shot without any type of deadly force. Yes, she was screaming because she was scared. She was terrified. People broke into her house without a reason. She has no idea why, and they shot her dog, and they started a firefight. But there is no evidence that she did anything under Tennessee v. Garner to justify deadly force towards her. And what we have from Officer Gallegos' testimony is he isn't even saying that. He knows that there isn't deadly force under our facts. That's why he's disputing them. He's saying she went for Officer Medina's gun. And what we know is, immediately after this event, when IID investigated, they asked him specifically, did she grab his gun? And he says, no, she didn't touch it. She just was grabbing at it. Explain how she got gunshot residue on her hands. Sure. There was 30 to 40 gunshots in that house. That's not unsurprising that everybody in that building would have gunshot residue on it. Is that what the expert said? Yes, that is what the expert said. On their hands, gunshot residue flies through the air. It spreads as it's shot. There was many, many shots. That's how the science works. Was it on her face? I don't believe they tested her face, but it likely would have been if they would have tested it. What they didn't do is they didn't test for any DNA on the gun. They didn't test for fingerprints on the gun. He says that she grabbed when he changed his testimony years later, and he says that she grabbed the gun and pulled it. They didn't test for DNA, probably because he didn't tell them in his IID statement that she had grabbed the gun. So every single person in that house, even the officers who didn't shot, would have had gunshot residue on their hands. That's just the reality of how they were shooting. Our expert in his deposition, I don't have the site off right now, but our expert in his deposition talked about that issue. Mr. Maloney, who's an NCIS investigator, and I can supplement the question. Is that in the written report? I don't know if it's in his report, but I do believe it's in his deposition. It could also be in his report. I don't recall if he addresses it. But I don't think in the forensic experts from the City of Houston would confirm the same thing. That is just how gunshot residue works, particularly when you're dealing with shotguns and ARs and other guns that are being shot in that. I do want to cover the video in the grainy still shot just quickly because I think it is important because I don't think it's definitive of anything related to Felipe Gallegos as far as being able that it's not him. They're brief. They said that they adjusted the brightness and contrast of that video. That is the exact type of issue that Justice Scalia, when he was talking about Scott v. Harris, he said jurisdiction is created when there's a clear and obvious contradiction of the video and physical evidence. If you're adjusting the brightness, if you're adjusting the contrast of the sharpness of it, particularly with a grainy photo of an officer leaning over a car showing his body camera, that isn't clear evidence. I think my time's running out. If you have any questions, I can answer them. If not... Don't think so. Thank you. Thank you. All right. Mr. McVane. So one thing I thought was interesting in my friend's argument, we heard about a lot about Ms. Nicholas's perspective. We heard a lot about the expert's perspective, the fraudulent warrant, which Gallegos undisputably knew nothing about. Mr. Tuttle's perspective, what Graham v. Conner in the case has asked this court to do in reviewing this order, we've got to be from Officer Gallegos's... Did Gallegos testify that Tuttle was sitting on his rear facing him and pointing the gun at him? I believe the testimony was that Tuttle was facing him and that he reached and brought the gun up. I believe that was the testimony. And that he flinched, Gallegos I believe also said flinched, and that's when the shot was fired. But I really want to address everything that's been said about where we're counting the number of bullets in the first beginning part of the firefight, and is it 15 to 12 or 19 to 21, and that there's been conflicting testimony. There's a case that I think is really important on all this stuff that Judge Jones wrote called Ontiveros v. Cydia Rosenberg, and that's a 2009 case, 564 F3rd 379. And in that case, there was about eight seconds. It was the same type of arguments. An officer went into a trailer, there was about eight seconds, the plaintiff's decedent was in the back room of the trailer, and within eight seconds, the one officer who had gone back there to find him to arrest him said that he had seen the plaintiff's decedent reaching for a gun and he shot him. And there was all kinds of evidence, like the people, that there wasn't enough time, that the stories had changed, and that the boots had been moved around maybe. And there was all this, what that opinion talked about as conjecture. And that's what this really is, conjecture. There are facts in this case that we can put our hands upon very clearly to analyze the objective reasonableness, or lack thereof, but really it was objective reasonableness, that Officer Gallegos acted with. And if Officer Gallegos's memory differs over the years since this has occurred and the many times he's been questioned, that is certainly attributable to many, many, many things in this seriously most traumatic event that you could even imagine in a person's life viewed from his perspective. What is the earliest record side of Gallegos explaining how tunneled was his positioning during the fatal shot? I think the first one you'd have to go to would be the IAD report. But I would also say, and this is going back to Ontiveros again, conflicts in testimony can't make a reasonable shooting unreasonable. There's still got to be facts from which you could ever say, well, this was unreasonable. And the fact is, the idea that you would infer from an officer who's literally paralyzed on the ground, having been just shot in the neck, and witnessed two of his comrades come try to rescue him and get shot in the face. Was that friendly fire, as he suggests? Well, we, I mean, we certainly do. There was not any evidence that it was... You can't, you don't have forensic evidence because I assume that was... Travonal. And there's not evidence putting that coming out of Mr. Tuttle's gun. It doesn't make much sense that anybody else would be shooting those officers in the face as they approached the door to rescue. I thought the plaintiff's expert report said they were shooting outside the doorway. They were in part because some of the shots hit the doorframe and the side of the house, and they were shrapnel. And that's what blew back, essentially, and hit the officers in the face. Is that in, that seems to be in the plaintiff's expert report. Well, and again, we're from Officer Gallegos' perspective, and there's no evidence that Officer Gallegos believed... That's the point to me. He didn't know at the time that it was friendly fire. We've got evidence it was friendly fire, and we have to accept that as true. Well, you, I think you do, but then we've got to go, number one, two, we've got to go from Officer Gallegos' perspective. I agree. Okay, okay. I'm sorry. We have to accept on this record that it was friendly fire. Now, we can still say Gallegos had no way of knowing that, but you can't argue it wasn't friendly fire on this record right now. I think that that's a fair way to look at it, Judge, but I also think that whether it was friendly fire or not is immaterial, except to the extent that Officer Gallegos knew it, and there's absolutely no evidence that he knew it and he didn't know it. If there's no further questions, thank you very much. Okay, I guess not. Thank you. This actually concludes our oral arguments for this morning. We thank you both very much, and we are in recess until 9 o'clock tomorrow morning.